UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|                        |   |                                |
|------------------------|---|--------------------------------|
| R. H. MANDEVILLE,      | ) |                                |
|     Plaintiff,         | ) |                                |
| v.                     | ) | Civil Action No. 13-12726-LTS  |
| LUIS SPENCER,          | ) |                                |
|     Defendant.         | ) |                                |

MEMORANDUM AND ORDER ON
<u>DEFENDANT'S MOTION TO DISMISS</u>

July 18, 2014

SOROKIN, D.J.

The pro se Plaintiff, R. H. Mandeville, is an inmate currently incarcerated at the Old Colony Correctional Center in Bridgewater, MA ("OCCC"). He brings this eight-count Complaint against Defendant, Luis Spencer, Commissioner of the Massachusetts Department of Correction, pursuant to 42 U.S.C. § 1983, alleging violations of his rights under the First, Fifth, Sixth, Eighth, Thirteenth, and Fourteenth Amendments of the Constitution, with respect to conditions of his confinement. He also alleges violations of the Massachusetts Declaration of Rights and several state statutes and regulations, and brings state common law malpractice and defamation claims.

For the reasons that follow, Defendant's Motion to Dismiss (Doc. No. 23) is ALLOWED IN PART.

I.  FACTUAL BACKGROUND

The following facts are drawn from Mandeville's Complaint (Doc. No. 1).[1] At all relevant times, Mandeville was an inmate at either the Massachusetts Correctional Institution in Shirley, Massachusetts ("MCI-Shirley"), or the OCCC. Compl. ¶ 2-1. In approximately 2009 to 2010, while Mandeville was at MCI-Shirley, Compl. ¶¶ 4-6, 4-7, a "clinician" named George Clark, told Mandeville he had a mental illness. Compl. ¶ 4-1. Clark, a licensed social worker, was Mandeville's Primary Care Clinician. Compl. at 18 (Ex. A1). For a period of time, Clark, and subsequently, a Dr. Ackers, had contact with Mandeville once a month. Compl. ¶¶ 4-3 to 4-6. Eventually, Mandeville was called to appear before a "Special Classification Committee," at which point he was informed of his reclassification to the OCCC. Compl. ¶ 4-7. Mandeville then filed a "classification statement," dated October 16, 2010, with Correctional Programs Officer ("CPO") Martha Mabley,[2] objecting to his reclassification. Compl. ¶ 4-8; Compl. at 19-21 (Ex. A2). Mandeville also wrote a letter to the presiding Superintendent.[3] Compl. ¶ 4-8.

Mandeville was ordered to pack his personal property for the transfer to the OCCC. Compl. ¶ 4-9. He was "forced above Plaintiff's objections, to sign papers. Plaintiff was forced by intimidation of 'Disciplinary Reports', [*sic*] etc." Compl. ¶ 4-10. These reports are not further described or identified in Mandeville's Complaint. "Plaintiff c[ro]ssed out everything on the papers to be signed and later found information writ[t]en – in [*sic*] after the Plaintiff crossed everything out, and signed. This was found on one (1) report." Compl. ¶ 4-11. Mandeville does not identify the report to which he refers or any of its particulars.

---

[1] In keeping with the standard of review applicable to motions to dismiss, factual allegations are recited as if true. See Arturet-Velez v. R.J. Reynolds Tobacco Co., 429 F.3d 10, 13 (1st Cir. 2005).
[2] CPO Mabley attended Mandeville's reclassification hearing. Comp. ¶ 4-7.
[3] Mandeville appends this letter to his Complaint, marked as Exhibit A3. Compl. ¶ 4-8. Its stated purpose is "Protection from a Security Threat Group." Compl. at 22-23 (Ex. A3). It complains of forced sessions with Dr. Ackers by "Mental Health Management" under threat of Mandeville receiving a "Disciplinary Report" for noncompliance. Id.

After arriving at the OCCC, Mandeville clearly indicated he "wanted nothing to do with mental health." Compl. ¶ 4-13. After approximately two months Mandeville was sent to see an OCCC clinician, but resisted ongoing treatment. Compl. ¶ 4-14. He was "interested in 'Extra Sensory Preception' [sic] (ESP) testing and it was not apart [sic] of his treatment." Compl. ¶ 4-16. After an "Internal Paremeter [sic] Security Team" interviewed Mandeville, clinicians told him "they felt nothing was wrong" but "they said they had to check with 'The Captain[,]'" who appeared to be "running the show." Id. Mandeville was sent to the Bridgewater State Hospital for evaluation and was returned to the OCCC in twenty-eight days.[4] Compl. ¶ 4-16. Subsequently, he refused to speak with clinicians. Compl. ¶ 4-17. Clinician Colin Knox, at the "Health Services Unit," asked Mandeville to sign papers. Compl. ¶¶ 4-17, 4-18. "The Plaintiff was angry and refused, and sent to the 'Segregation' unit for five (5) days and sentenced to san[c]tions unrelated to signing any documents. Plaintiff was never punished for not signing documents." Compl. ¶ 4-18.

At MCI-Shirley Mandeville had a private cell. Compl. ¶ 4-32. Now, Mandeville must share a cell, which, he states, is only about seventy square feet. Compl. ¶ 4-24. The OCCC keeps all in-cell toilet doors locked in the open position, exposing use of the toilet to all those who walk by the cell. Compl. ¶ 4-22. Staff making rounds have removed curtains Mandeville has placed over the door to obstruct viewing, and "some female staff have also made rounds and viewed the Plaintiff engaged in def[e]cation, etc." Compl. ¶ 4-25. He "has taken 'Grievance' about allowing Plaintiff and other inmates to close their door by hand for such purposes[,]" but his grievance was denied and his appeal "was never answered." Id. Mandeville's toilet, which he shares with a cell-mate, is set on a timer which shuts off the toilet for one hour if it is flushed

---

[4] Here, Mandeville adds a footnote which states: "The study was not [a p]art of the Plaintiff's treatment and is 'Privileged' pursuant to 'Mass., [sic] General Laws' (MGL), chapters 112 § 129A and §§ 132A and 132B 233 § 20B [sic]." Compl. at 5, 6 n.2.

3

twice within five minutes. Compl. ¶ 4-23. Upon request, the toilets can be reset in the Officer's Control Station, but some officers will not comply. Id.

While at MCI-Shirley, Mandeville had been gainfully employed in the Industries portion of the Department of Correction ("DOC"), "had satisfactory work reports and was earning a good wage for a prisoner, with the hopes of[] pay raises, etc." Compl. ¶ 4-33. "Since Plaintiff was at the OCCC, Plaintiff has had small jobs which do not pay well, and at times ev[e]n had to file a 'Grievance' against the 'Jobs Assignment Officer' for a job that pays far less tha[n] Industries." Compl. ¶ 4-34.

Mandeville wrote letters to the Attorney General in hopes of resolving his problems. Compl. ¶ 4-19. He also wrote letters to "Federal Agencies" including the "Postal Inspector, the U.S., [sic] Attorney, and may be [sic] the 'Federal Bureau of Investigation' (FBI)." Compl. ¶ 4-26. He learned of a "perjuried [sic] report" that was filed for the purpose of sending him to the Bridgewater State Hospital. Compl. ¶ 4-20. While at the OCCC, Mandeville met with the classification board annually. Compl. ¶ 4-21. After his 2012 hearing he gave a classification statement of appeal to the board and/or his CPO, but received no response. Id.

In total, Mandeville objects to his transfer to the OCCC because he no longer has a private cell, his cell is too small for two people, he lost the job he had at MCI-Shirley, his toilet does not work as desired, the toilet door is locked in the open position, he believes he is entitled to uncensored mail, free postage, and unmonitored phone calls, and he believes he has a right to make photocopies at a capped fee. Compl. ¶¶ 4-22, 4-23, 4-24, 4-32, 11-1, 12-1. Furthermore, he asserts that the DOC classification system has been "abolished" as to him, Compl. ¶ 6-1, and he claims defamation for having been branded "Profoundly Psychotic" and "Delusional," Compl.

¶ 7-1 and Compl. at 29 (Ex. A7), and malpractice for having been diagnosed as paranoid and schizophrenic, Compl. ¶10-1.

Each of the eight counts in Mandeville's Complaint contains mixed allegations of violations of federal and state laws. The federal claims are constitutional violations brought under § 1983. The state claims assert violations of the Massachusetts Declaration of Rights, various statutes and regulations, and common law defamation and malpractice. Mandeville seeks a return to MCI-Shirley, reinstatement in his private cell, and reinstatement of his previous employment together with back wages and projected pay increases. Compl. at 16. In addition, he wants to receive "all the benefits entitled to those classified as mental[ly] ill," though he wants his psychiatric reports purged. Id. He wants access to free postage, uncensored mail, and unmonitored phone calls. Id. Furthermore, he asks the Court to enjoin the DOC and others from harassing him in his right to petition the courts, and he seeks an award of fifty thousand dollars in damages. Id.

Spencer now moves to dismiss Mandeville's Complaint for failure to state a claim.

II. STANDARD OF REVIEW

To survive a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). The Court "must take the allegations in the complaint as true and must make all reasonable inferences in favor of the plaintiff[]." Watterson v. Page, 987 F.2d 1, 3 (1st Cir. 1993). "[F]actual allegations" must be separated from "conclusory statements in order to analyze whether the former, if taken as true, set forth a plausible, not merely a conceivable, case for relief." Juarez v. Select Portfolio Servicing, Inc.,

708 F.3d 269, 276 (1st Cir. 2013) (internal quotations omitted). This "highly deferential" standard of review "does not mean, however, that a court must (or should) accept every allegation made by the complainant, no matter how conclusory or generalized." United States v. AVX Corp., 962 F.2d 108, 115 (1st Cir. 1992). Dismissal for failure to state a claim is appropriate when the pleadings fail to set forth "factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory." Berner v. Delahanty, 129 F.3d 20, 25 (1st Cir. 1997) (quoting Gooley v. Mobil Oil Corp., 851 F.2d 513, 515 (1st Cir. 1988)) (internal quotation marks omitted).

"[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 556 U.S. at 678. A court's assessment of the pleadings is "context-specific" requiring "the reviewing court to draw on its judicial experience and common sense." Id. at 679; accord Maldonado v. Fontanes, 568 F.3d 263, 268 (1st Cir. 2009). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – 'that the pleader is entitled to relief.'" Iqbal, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

III. DISCUSSION

Mandeville challenges his conditions of confinement under § 1983, and through various state law claims. As he is proceeding pro se, the Court liberally construes his pleadings. Cooper v. Chao, 71 F. App'x 76, 77 (1st Cir. 2003). Despite his pro se status, however, he is not exempt from complying with the "relevant rules of procedural and substantive law." Eagle Eye Fishing Corp. v. U.S. Dep't of Commerce, 20 F.3d 503, 506 (1st Cir. 1994).

6

Spencer asserts that Mandeville's Complaint fails in its entirety for lack of exhaustion and on the merits. Mandeville opposes Spencer's motion.

A. Classification Claim

Mandeville's chief complaint is his reclassification and transfer to the OCCC, as he preferred the conditions of his confinement at MCI-Shirley.[5]

Upon commitment to the DOC, an inmate undergoes a classification process, which culminates in an Initial Classification Hearing, to determine the inmate's location and program placement within the system. 103 Mass. Code Regs. 420.08. Generally, subsequent classification, or reclassification, occurs at least annually. 103 Mass. Code Regs. 420.09. For reclassification the CPO assigned to the inmate conducts an Internal Classification Status Review, which, if a possible transfer is involved, includes consultation with mental health professionals when indicated. 103 Mass. Code Regs. 420.09(1)(g), (2). If a transfer appears necessary, a three-person board will convene a full classification hearing in accordance with 103 Mass. Code Regs. 420.08(1), (3)(a)-(j). 103 Mass. Code Regs. 420.09(4). An inmate may request a hearing or review earlier than scheduled. 103 Mass. Code Regs. 420.09(5). In either case, where the inmate objects to the outcome of the review, the inmate may appeal within five business days of written notification of the review results by submitting an appeal form to the inmate's CPO. 103 Mass. Code Regs. 420.09(3). The Superintendent, or a designee, is the reviewing authority on the appeal and his or her decision is final. Id.

Mandeville asserts that while at the OCCC he met annually with the classification board. Compl. ¶ 4-21. In his 2012 meeting, the board told him "his mental health case was still open and the board had no real powers to order a transfer[]" back to MCI-Shirley. Id. However, Mandeville's CPO accepted a classification statement from him, Compl. at 24-26 (Ex. A4), and

---
[5] Both MCI-Shirley and the OCCC are medium-security facilities.

7

told him "it would be forwarded to the central classification office as a statement/appeal." Id. Nothing more before the Court describes the outcome of this appeal. Taking Mandeville's well-pleaded allegations as true, as the Court must, this is sufficient for Mandeville to avoid failure of his classification-based claims on exhaustion grounds, at this stage and on the present record. This is especially so as the defendant bears the burden of establishing that Mandeville failed to exhaust, Cruz Berrios v. Gonzalez-Rosario, 630 F.3d 7, 11 (1st Cir. 2010), and Spencer failed to submit any documents or information whatsoever to meet his burden of proof. Doc. No. 24 at 3-5; cf. Hicks v. Ryan, No. 13-10709-RGS, 2014 WL 250338, at *4 (D. Mass. Jan. 21, 2014) (finding plaintiff failed to exhaust based upon affidavit and documents submitted by defendant to meet its burden of proof); Fahey v. Fed. Bureau of Prisons, No. 09-40066-RGS, 2009 WL 4841082, at *3 (D. Mass. Dec. 11, 2009).

*Retaliation*

Mandeville alleges his transfer was made in retaliation for filing a petition for a writ of habeas corpus of which at least Dr. Ackers was aware. Compl. ¶¶ 4-37, 4-39, 6-1, 7-1; Compl. at 30-31 (Ex. A8). He further complains that the transfer from MCI-Shirley to OCCC deprives him of his private cell and his previous, higher-paying job. In Count I (First Cause of Action) he claims his reclassification violated his Fourteenth Amendment right to equal protection of the laws.

Mandeville has no constitutional expectation to be placed in, or remain in any particular institution. See 18 U.S.C. § 3621(5); Meachum v. Fano, 427 U.S. 215, 228 (1976) ("prison officials have discretion to transfer [a prisoner] for whatever reason or for no reason at all"). "[D]espite the deference owing to the decisions of prison officials, retaliation against a prisoner's exercise of constitutional rights is actionable." Hannon v. Beard, 645 F.3d 45, 48 (1st Cir.

8

2011). To establish a retaliation claim Mandeville must allege "that he engaged in a protected activity, that the state took an adverse action against him, and that there is a causal link between the former and the latter." Id. A causal connection may be overcome if prison officials had an independent permissible reason for the action. Schofield v. Clarke, 769 F. Supp. 2d 42, 47 (2011); see Brown v. Corsini, 657 F. Supp. 2d 296, 305 (D. Mass. 2009).

Mandeville's Complaint fails to allege a sufficient causal nexus to satisfy the third prong of a retaliation claim. First, Mandeville claims that his 2010 transfer was in retaliation for petitioning the court for a writ of habeas corpus. However, he filed his petition in the United States District Court for the District of Massachusetts on September 27, 2005, approximately five years before his transfer. Mandeville v. Thompson, No. 1:05-cv-11969-MLW (D. Mass. Mar. 31, 2014). His case was stayed in 2006 pending the resolution of state court proceedings, reopened in 2012, and dismissed in 2014. This is insufficient to suggest a temporal connection to Mandeville's 2010 transfer.

Second, Mandeville suggests a deviation from standard procedure sufficient to warrant a retaliatory inference. See Hannon, 645 F.3d at 49. He claims the DOC "abolished" the application of the classification system as to him and "turned the system and Plaintiff to the unsupervised psychiatric department in which Classification, see 103 CMR 420. [*sic*] has and is unable to supervise and has no control over [*sic*]. Compl. ¶ 6-1. He offers no supporting facts. The only relevant facts he alleges, that he met with the classification board annually, had contact with his CPO about his classification, and was able to file an appeal, tend to demonstrate conformance with standard procedure rather than deviation. His allegations fail to plausibly allege a deviation from standard procedure sufficient to support a retaliation claim.

9

Finally, Mandeville does assert that, on occasion, he was forced to sign papers, but provides no details of the circumstances. In one instance, "Plaintiff c[ro]ssed out everything on the papers to be signed and later found information writ[t]en – in after the Plaintiff crossed everything out, and signed." Compl. ¶ 4-11. Mandeville does not state when he was required to sign the papers, the purpose of the papers, the impact of him signing them, or what was added after he signed. He also alleges he "learned that a perjuried [*sic*] report was filed to have Plaintiff sent to the [Bridgewater State Hospital], by a Dr. K. Garvey: Psychiatrist." Compl. ¶ 4-20. He does not state what was in the report or how it was false. The Court understands that Mandeville objects to his psychiatric diagnosis.[6] That, by itself, does not plausibly suggest that a report has been falsified. Without any inference of a causal link between these activities and his transfer, his retaliation claim, Count I, fails.

B. Exhaustion

Mandeville has alleged other federal claims, each challenging some aspect of the conditions of his confinement. Excepting a complaint regarding his toilet door, Mandeville's filings strongly suggest he has failed to exhaust his administrative remedies as to all of these claims.

Under the Prison Litigation Reform Act ("PLRA"), "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). This is so even if the available administrative remedies do not allow for the specific relief sought. Woodford v. Ngo, 548 U.S.

---

[6] In his prayers for relief Mandeville asks the Court to "[p]urge any and all psychiatric reports up to and leading to [the] transfer of the Plaintiff, and reports since and to [the] current day from DOC psychiatric and institutional files[.]" Compl. at 16 ¶ D. At the same time he wants to "receive all the ben[e]fits entitled to those classified as mental[ly] ill[.]" Compl. at 16 ¶ B.

81, 85 (2006); Booth v. Churner, 532 U.S. 731, 740-41 (2001). The PLRA employs an "invigorated" exhaustion requirement designed "to reduce the quantity . . . of prisoner suits" by dispensing with claims that clearly lack merit. Woodford, 548 U.S. at 84 (quoting Porter v. Nussle, 534 U.S. 516, 524 (2002)). "Prisoners must now exhaust all 'available' remedies, not just those that meet federal standards." Id. at 85. Exhaustion is mandatory "for any suit challenging prison conditions, not just for suits under § 1983." Id. Massachusetts has a similar requirement of exhaustion embodied in Mass. Gen. Laws ch. 127, §§ 38E-38H, governing "all grievances arising out of or resulting from a condition of or occurrence during confinement, whether or not said grievance is presented in the form of petition for a writ of habeas corpus." Mass. Gen. Laws ch. 127, §§ 38E, 38F.

Lack of exhaustion is an affirmative defense and "inmates are not required to specially plead or demonstrate exhaustion in their complaints." Jones v. Bock, 549 U.S. 199, 216 (2007).[7] If, however, the inmate's complaint on its face demonstrates non-exhaustion, any unexhausted claims may be subject to dismissal. See id. at 215; Cullinan v. Mental Health Mgmt. Corr. Servs., Inc., No. 11-10593-JLT, 2012 WL 2178927, at *3 (D. Mass. June 11, 2012).

Massachusetts has established an extensive set of procedures for prisoners to grieve complaints. See 103 Mass. Code Regs. 491. Mandeville attaches some grievance documents regarding the toilet door to his Complaint and alleges, "Plaintiff see no future in awaiting for the DOC."[8] Compl. ¶ 4-37. Mandeville also attaches to his Complaint several letters written to DOC officials regarding aspects of his conditions of confinement. Exs. A2, A3, A4, A8.

---

[7] Therefore, that "it does not appear, nor does the plaintiff allege . . . that he properly exhausted his administrative remedies," as Spencer argues, Doc. No. 24 at 3, is of no legal significance under the governing Supreme Court precedent which does not require Plaintiff to allege exhaustion.
[8] He also states that he wrote to the Massachusetts Attorney General, the Defendant, and others in an attempt to resolve his issues. Compl. ¶ 4-19. These communications do not bear on exhaustion, however.

11

In response to Defendant's exhaustion argument, Mandeville states that "Plaintiff has exhausted his administrative remedies. See Complaint and 'Exhibits A2 [, A3, and A4],' a classification statement pursuant to 103 CMR 420. . . . See 'Exhibit A5' and 'Grievance' on toilets and open cell doors. . . . See 'Exhibit A8' and letter of 21 Aug. 2013, and no response from the Defendant. . . . Plaintiff also took issue with the 'Attorney General' . . . As to the issues of telephone and postage, Plaintiff did write the Superintendent, . . . here at the OCCC and made complaint if [sic] of being locked in cages, and other interviews concerning (non) exist[e]nt letters to the Defendant. Also in the letter, as a matter of the subject of civil rights, Plaintiff made mention of postage which [sic] Plaintiff was entitled, and un[c]ensored letters, as well as un[c]ensored phone calls. . . . Plaintiff also made mention to the 'Attorney General[.]' . . . Plaintiff had done everything to exhaust remedies and to settle the matter through classification and grievances to no avail . . . ." Doc. no. 39 at 1-3. Also, in reference to securing copies of his psychiatric file, he states, "105 CMR 205.505 allows only for the charge of twenty cents ($.20) for photo copies, per page and is [sic] charged research fees, also. Plaintiff grieved this before the AG to no avail." Compl. ¶ 13-1.

In short, as Mandeville alleged in his Complaint and explained in his opposition, he filed a grievance regarding the toilet door, appealed his classification as described above (which the Court has addressed on the merits in light of Spencer's failure to establish non-exhausation) and <u>outside</u> the grievance process raised complaints with both DOC and non-DOC officials. "The PLRA exhaustion requirement demands compliance with the prison's requirements which 'define the boundaries of proper exhaustion.'" <u>Carter v. Symmes</u>, 2008 WL 341640, at *3 (quoting <u>Jones</u>, 549 U.S. at 218). Mandeville's filings strongly suggest that – other than classification and the toilet door – he has failed to exhaust his administrative remedies. In these

circumstances, the Court has a serious doubt as to whether Mandeville has exhausted his administrative remedies regarding his federal claims other than the claims arising out of the classification decision or the toilet door. Thus, the parties shall submit further evidence regarding exhaustion. Spencer shall make his submission no later than August 8, 2014, and Mandeville shall file any further supplemental submission 14 days thereafter. The parties shall submit only (1) submissions evidencing exhaustion or non-exhaustion; and (2) an optional supplemental memorandum not to exceed three pages. Hattrick v. FMC-Devens Staff, No. 06-40238-RWZ, 2008 WL 687410, at *5 (D. Mass. Mar. 5, 2008).

Regarding the toilet door, plainly, Mandeville grieved his complaint, Compl. at 27 (Ex. A5), which was denied. Id. Mandeville alleges he appealed this denial. Compl. at 28 (Ex. A6). While the omissions of signatures from either Mandeville or a DOC official on his appeal form, id., raises a question whether Mandeville actually submitted the appeal, Spencer bears the burden of proof. On the present record, the Court cannot conclude that Spencer has met his burden of proof.

However, Mandeville's toilet door claim, Count III (Third Cause of Action), fails to state a claim.[9] "An inmate's lack of privacy while using the toilet or shower [] does not violate the Eighth or Fourth amendments." Spencer v. Bender, No. 08-11528-RGS, 2010 WL 1740957, at *3 (D. Mass. Apr. 28, 2010) (citing Sanders v. Kingston, 53 F. App'x 781, 784 (7th Cir. 2002)). Insofar as Mandeville alleges a Fourteenth Amendent equal protection claim, he has failed to state a claim on this theory as well. Mandeville makes no assertion that he is treated differently than others similarly situated for purposes of the Fourteenth Amendment's equal protection

---

[9] Count III also states that Mandeville has the right to working toilets. He makes no assertion, however, that his toilet does not work. See Compl. ¶ 8-1. He says only that the toilets at the OCCC operate whereby, upon flushing twice within five minutes, the ability to flush is suspended for one hour. Compl. ¶ 4-23. The Court notes, therefore, that he has not stated a claim that his toilet is defective.

clause. See Engquist v. Oregon Dep't of Agric., 553 U.S. 591, 602 (2008). To the contrary, he asserts that the OCCC keeps all in-cell toilet doors locked in the open position. Compl. ¶ 4-22, Ex. A5. Finally, Mandeville asserts, in this Count, a right to "toileting in privacy," under 105 Mass. Code Regs. 451.011-.013.[10] Compl. ¶ 8-1. These regulations, however, in concert with 105 Mass. Code Regs. 451.101-.214, establish minimum health and sanitation standards for correctional facilities, and do not address privacy of toilets within cells. See 105 Mass. Code Regs. 451.011-.013. Thus, the Motion to Dismiss is ALLOWED as to Count III insofar as it raises federal claims arising out of the toilet door.

C. CONCLUSION

For the foregoing reasons, Defendant's Motion to Dismiss (Doc. No. 23) is:

(1) ALLOWED as to Plaintiff's federal claims arising from the classification decision and the toilet door, Counts I and III;

(2) UNDER ADVISEMENT as to the remaining issues. Spencer shall submit, by August 8, 2014, evidence of non-exhaustion and an optional supplemental memorandum not to exceed three pages. Mandeville shall submit, by August 22, 2014, evidence of exhaustion and an optional supplemental memorandum not to exceed three pages.

SO ORDERED.

  /s/ Leo T. Sorokin
Leo T. Sorokin
United States District Judge

---

[10] He also asserts the right to "toileting in privacy" under Mass. Gen. Laws ch. 123, § 23. Compl. ¶ 8-1. This statute, however, pertains to Department of Mental Health facilities and is inapplicable to Mandeville. Mass. Gen. Laws ch. 123, § 23; see § 1 ("'Facility', a public or private facility for the care and treatment of mentally ill persons, except for the Bridgewater State Hospital.").